In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 24-2977, 24-3017, & 24-3018

UNITED STATES OF AMERICA,

*Plaintiff-Appellee.*

*v.*

MARINA OKE, NAWOMI AWOGA,
and ASSIBA LEA FANDOHAN,

*Defendants-Appellants.*

---

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00397 — **John Robert Blakey**, *Judge.*

---

ARGUED NOVEMBER 13, 2025 — DECIDED AUGUST 13, 2026

---

Before EASTERBROOK, LEE, and MALDONADO, *Circuit Judges*.

MALDONADO, *Circuit Judge.* In 2014, a Beninese woman, Nawomi Awoga, and her two adult daughters, Marina Oke and Assiba Lea Fandohan, conspired to unlawfully bring two Beninese girls, aged 11 and 14, to the United States. The girls' families were told their daughters would have greater

opportunities, like attending school and earning money to send back to their families. Awoga obtained false identification and travel documents for both girls as part of a fabricated narrative to feed immigration officials. After the girls arrived in the United States, Awoga and her daughters forced them to work seven days a week in their homes without pay. They physically and psychologically abused the girls, restricted their access to the outside world, and forbade them from attending school and obtaining medical care.

After years of abuse, each girl escaped separately, and Awoga and her daughters Oke and Fandohan were charged with conspiracy to harbor and shield unauthorized aliens, 8 U.S.C. § 1324(a)(1)(A)(v)(I); harboring and shielding unauthorized aliens, *id.* § 1324(a)(1)(A)(iii), (B)(i); and forced labor, 18 U.S.C. § 1589(a)(1), (a)(4), (d). A jury returned a guilty verdict on all counts, and the district court denied defendants' post-trial motions for acquittal or for a new trial.

Defendants now appeal, challenging the sufficiency of the evidence at trial and the reasonableness of their sentences. Because the jury credited the girls' testimonies, the trial evidence amply supported the convictions, and none of defendants' within- or below-guidelines sentences reflects an abuse of discretion, we affirm.

**BACKGROUND**

### I.    Factual Background

The victims in this case, R.O. and F.A., each testified at trial about the false promises of education and work that lured their families into sending them from Benin to the United States. Awoga, a cousin of R.O.'s father, offered to take R.O., then 11 years old, to the United States to repay R.O.'s

grandmother who had helped raise Awoga. Awoga promised R.O.'s father that R.O. would attend school in the United States. As for F.A., Oke's husband had served as pastor at a church that F.A.'s family attended in Benin. Through this connection, Oke contacted F.A.'s parents and proposed that F.A., then 14 years old, come live with Oke in the United States, learn to work in her hair braiding salon, and attend school.

During the summer of 2014, before coming to the United States, Awoga coached R.O. and F.A. on a false narrative to provide to immigration officials. The girls were to indicate that they were sisters traveling to the United States with their parents for vacation. Awoga obtained false passports with new identifying information for the girls. After receiving tourist visas with their fake passports in September 2014, the girls flew from Benin to Chicago with Awoga and a couple pretending to be their parents. Though they had a return flight booked for the next month, neither Awoga nor the girls boarded that flight.

## A. Life in the United States

Once in the United States, R.O. and F.A. lived with Oke in Country Club Hills, Illinois. After a few weeks, the girls were split up, with R.O. moving in with Fandohan and Awoga, who lived in nearby Hazel Crest, Illinois. Over the next few years, neither girl attended school, and both were instead forced to work long hours doing household chores and caring for Oke and Fandohan's five children (two school age children, two toddlers, and a newborn).

Oke required F.A. to complete daily chores, including handwashing the family's laundry and cleaning the entire house. F.A. cooked the children's meals, fed them, and cared

for them, even attending to Oke's infant in the middle of the night. Oke instructed that F.A. was not allowed to go to bed until her chores were done, sometimes extending her day until 2:00 or 3:00 a.m. She was not allowed to take a day off and had to wake up early to resume her work.

F.A. testified about the physical abuse that Oke inflicted on her when she did not perform her duties to Oke's satisfaction. Oke hit F.A. when she made mistakes in her chores or couldn't finish them during the day. F.A. described being beaten for accidentally falling asleep while putting the baby to bed. Oke hit F.A. with a fufu stick, a long Beninese cooking utensil, and slapped or hit F.A. with her fists across F.A's face and body. Oke once hit F.A. so hard with the fufu stick that F.A. lost her vision momentarily. Awoga, who sometimes stayed at Oke's home, also hit F.A. when she failed to complete chores.

F.A. regularly worked at Oke's hair braiding salon from Thursday to Saturday for long hours, after which she would return home and be expected to stay up to finish her chores. She received $50 a week from Oke plus any tips for her work at the salon, some of which she sent back to her family in Benin. At the salon, she was also expected to care for Oke's small children and often took breaks from work to change diapers or feed them. Oke instructed F.A. to tell anyone at the salon who asked that she was 18, even though she was only 14 or 15 years old.

F.A. was not allowed to leave the house on her own and was taught to fear the outside world. Oke frequently told her that Americans would rape and kill her, and that if the police found her, they would take her back to Benin. On one occasion, police officers approached the salon while F.A. was

working, and Oke told her to hide in the back. When F.A. was permitted to leave the house, to attend church or go on outings with the family to restaurants or the museum, for example, she was expected to take care of Oke's children. Oke only permitted F.A. to call her family in Oke's presence, and F.A. felt she could not speak openly with her family. By the time F.A. was permitted to call her parents on her own, Oke had convinced her there was nothing wrong with her situation, so she never shared details with her family.

R.O. experienced similar abuse and forced labor while living with Fandohan and Awoga. She was expected to complete daily household chores like cleaning, laundry, cooking, and childcare. Awoga beat R.O. with a fufu stick almost daily for "mistakes" she made during chores such as accidentally falling asleep. And, like F.A., R.O. was expected to care for the children in the home. When the pre-teen R.O. asked Awoga when she would start school, as she had been told she would, Awoga told her she was good for nothing and that she would beat her if she asked again. On another occasion, Awoga bit R.O.'s arm until she drew blood. Fandohan also frequently beat R.O. and called her a witch, worthless, and lazy.

Though she'd occasionally attend outings with the family, R.O. was afraid to ask anyone for help and did not speak English. When strangers came into Fandohan's house, Awoga and Fandohan instructed R.O. to hide. R.O. was permitted to take out the trash only after 2:30 p.m. so that neighbors would not suspect why she wasn't in school. Awoga monitored R.O.'s calls with her family in Benin and told her to lie to them that she was in school. Because of these experiences, both F.A. and R.O. lived in constant fear and anxiety.

The jury also heard a number of stipulations, including that the girls were never taken to a doctor even when ill, and never attended school, even though Fandohan and Oke sent their own children to school and to the doctor. Defense counsel read other stipulations into the record, including prior inconsistent statements the girls made to law enforcement officials in various interviews over the years.

**B.  The Escapes**

Eventually, both R.O. and F.A. ran away. R.O. did so first, in September 2016, two years after arriving in the United States. After Awoga accused R.O. of using her phone to call her family in Benin, she beat her with the fufu stick. R.O. then overheard Awoga on the phone tell someone she was going to beat her, tie her up, and grind pepper into her eyes. Fearing for her life, R.O. packed her bag, grabbed her passport, and stole $700 from under Fandohan's bed. She ran away and hailed a cab. She was 13 years old.

Still unable to speak English, R.O. approached a man in a store and gestured to use his phone. He noticed she seemed in need of help and called the police, after which R.O. was taken to Lurie Children's Hospital. R.O. was eventually placed in a foster home, where she remained at the time of trial while attending school.

The summer after R.O. ran away, in August 2017, law enforcement came to Oke's home to look for F.A., prompted by information from R.O. Oke told F.A. to hide in the bedroom, so F.A. hid behind clothes in a closet. Oke permitted the officers to search the house for F.A., but the officers never opened the closet and did not find her. Oke lied to the officers that she

hadn't seen F.A. in weeks and that F.A. did not work at her salon.

Immediately after this incident, Awoga, Fandohan, and Oke sent F.A. to Iowa with another family member. Over the next year, F.A. was shuffled around various friends' and families' homes, ultimately returning to Chicago. Eventually, in September 2018, F.A. ran away after continued mistreatment by her subsequent caretakers. She ran to a gas station where a woman helped her call the police. F.A. initially conveyed the false narrative Oke instructed she tell the police, but she eventually told them the truth. After staying in a shelter for a few years, F.A. attended college on a scholarship. At the time of trial, she was in her second year.

After their escapes, R.O. and F.A. received T-visas provided to victims of human trafficking. These allowed the girls to remain in the United States lawfully. In addition to shelter, their cooperation with the government resulted in their obtaining access to Medicare, immigration attorneys, and food stamp benefits.

## II.　　Procedural History

In July 2020, a federal grand jury returned an indictment charging Awoga, Oke, and Fandohan with harboring and shielding (and conspiring to harbor and shield) F.A. and R.O. (both "unauthorized aliens") from detection in the United States, in violation of 8 U.S.C. § 1324, and with forced labor, in violation of 18 U.S.C. § 1589. The harboring-and-shielding charges also alleged that defendants acted for the purpose of private financial gain, which if proven, would trigger a statutory enhancement and increase their maximum sentences from 5 to 10 years. *See* 8 U.S.C. § 1324(a)(1)(B)(i).

After a mistrial in January 2023, the case proceeded to a retrial in January 2024. Defendants were tried together, though each was represented by separate counsel. The government put on fourteen witnesses, including R.O. and F.A. Other testifying witnesses included R.O.'s father and sister; F.A.'s mother; officials from United States Customs and Border Protection, United States Department of Labor, and Illinois Tollway; the individuals who found R.O. and F.A. after they ran away; and the attending doctor and the social worker who treated R.O. in the hospital. The defense put on one witness, Houngo Prosper, who obtained a visa to come to the United States from Benin and lived for a while with the Okes.

During trial, defense counsel for each defendant orally moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The district court denied these motions. The jury convicted each defendant on all counts, and it found evidence supported the financial-gain enhancement for Oke and Fandohan. After trial, each defendant renewed her Rule 29 motion for judgment of acquittal and, in the alternative, moved for a new trial under Rule 33. Defendants primarily argued that F.A. and R.O.'s testimonies were not believable and had been irreparably impeached. The district court denied all three motions, stating that although there could be "rare cases where no reasonable jury could find an individual credible," this was not one. The court remarked that the jury considered defendants' "vigorous cross-examination" when weighing the evidence and that the motions merely questioned the jury's credibility determinations.

In September 2024, the district court sentenced Awoga, 75 years old at the time, to 102 months in prison; Oke to 94

months in prison; and Fandohan to 80 months in prison. Each was given a three-year term of supervised release.

## DISCUSSION

Defendants appeal, challenging the denial of their motions for judgment of acquittal and the substantive reasonableness of their sentences.[1]

### I.     Sufficiency of the Evidence

We review the denial of acquittal motions de novo, but "practically speaking … the standard of review is that for sufficiency of the evidence." *United States v. Maxwell*, 143 F.4th 844, 857 (7th Cir. 2025) (quoting *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016)). In determining whether the evidence was sufficient to convict, "we give great deference to the jury's verdict, viewing the trial evidence in the light most favorable to the verdict and drawing all reasonable inferences in the government's favor." *United States v. Coley*, 137 F.4th 874, 880 (7th Cir. 2025) (citing *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020)). This is a "nearly insurmountable hurdle," and we reverse "only where no rational trier of fact could have found the defendant guilty." *Maxwell*, 143 F.4th at 857 (quoting *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017)). The limited exception to this general rule is where a witness's testimony is "incredible as a matter of law." *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996).

---

[1] Although defendants' briefs conclude with a request for remand for a new trial, they offer no other indication that they appeal the district court's denial of their Rule 33 motions for a new trial. As a result, any such challenge is waived, and we review only the denial of their motions for acquittal.

Defendants insist there was insufficient evidence to convict under the harboring provision, 8 U.S.C. § 1324(a)(1)(A)(iii).[2] We disagree. That provision provides criminal sanctions for:

> Any person who … knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

The thrust of defendants' acquittal argument repackages what they already argued to the jury: The girls are not credible and were motivated to lie to avail themselves of government and immigration benefits.

"The high bar for deeming evidence insufficient extends still higher where, as here, the defendant challenges the credibility of witnesses." *United States v. Eiland*, 161 F.4th 494, 501 (7th Cir. 2025). It is the "exclusive function of the jury to determine the credibility of witnesses" at trial. *United States v. Godinez*, 7 F.4th 628, 638–39 (7th Cir. 2021) (quoting *United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989)). We have

---

[2] As noted above, defendants were also convicted of conspiracy to conceal and harbor F.A. and R.O. under § 1324(a)(1)(A)(v)(I), and forced labor under 18 U.S.C. § 1589, but they have not developed any argument on appeal as to these convictions. It is well-settled that "perfunctory and undeveloped arguments … are waived." *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (quoting *United States v. Berkowitz*, 927 F.3d 1376, 1384 (7th Cir. 1991)). So, we do not assess the propriety of these convictions.

repeatedly refused to disturb the jury's credibility determinations on appeal. *See United States v. Stevenson*, 680 F.3d 854, 857 (7th Cir. 2012). This is "particularly so where," as here, "the jury has been properly informed through cross-examination, jury instructions, or both." *Id.* (collecting cases).

First, any "inconsistencies in the details of the testimon[ies]" were "fully aired to the jury on cross-examination, but the jury still chose to credit [the victims'] stor[ies]." *See Alcantar*, 83 F.3d at 190. Each of defendants' counsel—three in total—rigorously cross-examined R.O. and F.A. about their motivations to lie to obtain government benefits. For example, the defense brought out on cross-examination the ways in which the girls' statements to government officials changed over time, and the jury heard stipulations entered to that same effect. The defense also underscored how the girls had forgone many opportunities to run away or ask for help. The girls were questioned at length about their T-visas and other government benefits received. And they responded to suggestions that they were lying that defendants hid them and made them fearful of going outside. Defense counsel also cross-examined Dr. Soni, the attending physician that treated R.O. at Lurie Children's Hospital, about how she hadn't seen fresh bruises or cuts on R.O., impeaching R.O.'s testimony that she was beaten just before running away.

Second, the jury was properly instructed to consider the girls' possible motives to lie and the impeachment evidence when assessing the truthfulness of the witnesses' statements. "We presume that the jury followed the court's instructions absent evidence of an overwhelming probability that the jury was unable to follow the instructions as given." *United States*

*v. Pierson*, 89 F.4th 976, 986 (7th Cir. 2024) (citations omitted). The jury credited the victims despite their impeachment.

Third, defendants' arguments write out of existence the corroborating evidence and testimonies from the twelve other government witnesses. For example, a Customs and Border Protection official testified about the girls' flight records and falsified travel documents (entered into evidence) that corroborated how the girls entered the United States.

To the extent that defendants cite cases reversing convictions because the inferences drawn from testimony were too speculative, none supports acquittal based on unreliable testimony. We agree that verdicts are not sacrosanct, but defendants offer no case supporting departure from established law cabining credibility determinations to the purview of the jury.

Nor were the girls' testimonies incredible as a matter of law. "Finding a witness incredible as a matter of law is typically reserved for 'extreme situations,' where, for example, it was 'physically impossible for the witness to observe what he described' or 'impossible under the laws of nature for those events to have occurred at all.'" *United States v. Jones*, 56 F.4th 455, 488 (7th Cir. 2022) (quoting *United States v. Conley*, 875 F.3d 391, 400 (7th Cir. 2017)). We reject defendants' attempt to "convert testimony that has been compromised into testimony that is incredible as a matter of law." *See Eiland*, 161 F.4th at 502.

Next, defendants insist that there was insufficient evidence showing they had an intent "to safeguard th[e] alien from the authorities," which is "the key question for a harboring case under § 1324(a)(1)(A)(iii)." *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 407 (7th Cir. 2020) (alteration in

original) (quoting *United States v. McClellan*, 794 F.3d 743, 751 (7th Cir. 2015)). We again disagree.

We cannot say that no reasonable trier of fact could have found, beyond a reasonable doubt, that defendants intended to safeguard R.O. and F.A. from the authorities. The jury heard R.O. and F.A. disclose the myriad times that defendants instructed them to hide from visitors and law enforcement. The jury heard how defendants taught the girls to fear the outside world, prohibited them from leaving the house alone, prohibited them from speaking to their families without supervision, and never sent them to school or to the doctor. As to F.A., the jury heard how defendants sent her to Iowa and shuffled her around friends' and families' homes immediately after law enforcement came to Oke's home to locate her. From this evidence, it was reasonable for the jury to infer that defendants intended to conceal the girls from detection by the authorities, particularly given the evidence of their involvement in unlawfully bringing them to the United States in the first place.

In addition to defendants' affirmative acts of concealment and harboring, we may also infer intent through evidence of the girls' underpayment and lodging. *See McClellan*, 794 F.3d at 751. The evidence here well surpassed "simple sheltering," such as an individual cohabitating with her undocumented boyfriend, which § 1324 does not reach. *See United States v. Costello*, 666 F.3d 1040, 1050 (7th Cir. 2012). In fact, this case is remarkably similar to *United States v. Calimlim*, 538 F.3d 706, 708–09, 714 (7th Cir. 2008), where an American family employed an undocumented Filipino victim as a housekeeper, forced her to work seven days a week, restricted her access to the outside world, and prohibited her from obtaining medical

care. Under those circumstances, we affirmed the convictions under the same harboring provision.

As for the financial-gain enhancement, a jury could reasonably conclude that Oke and Fandohan were motivated by the financial benefits that accompany free daily housework and childcare. The government proffered testimony from a Department of Labor investigator who testified about his calculations of what each victim was owed in backpay. Using the federal minimum wage and the hours reportedly worked by the girls, minus the cost of their food, rent, and incidentals, as well as F.A.'s weekly $50, he reported that R.O. should have been paid at least $67,325 and F.A. at least $85,991. That the girls were provided lodging, food, and clothes, does not preclude a financial-gain enhancement. *See Calimlim*, 538 F.3d at 714–15 (affirming financial-gain enhancement even where victim housekeeper was provided some payment, free lodging, and food, because "[a]n above-board arrangement with a housekeeper whose immigration status was not in question would have cost the [defendants] a great deal more money").

Considering the trial record before us—falsified identification documents, travel records, undercover photographs of F.A. working at the salon, victim testimonies, vigorous cross-examinations, and twelve corroborating witnesses—we comfortably conclude the jury had ample evidence to convict defendants under the harboring provision.

## II.      Reasonableness of Sentences

Defendants also challenge the substantive reasonableness of their sentences. We review for an abuse of discretion, upholding the sentences "so long as the judge offers an adequate statement of his reasons consistent with the sentencing factors

enumerated in 18 U.S.C. § 3553(a)." *United States v. Porraz*, 943 F.3d 1099, 1104 (7th Cir. 2019) (citing *United States v. Melendez*, 819 F.3d 1006, 1013 (7th Cir. 2016)).

We start by noting that Oke's 94-month sentence was 14 months below the low end of the guidelines range, and Fandohan's 80-month sentence was 7 months below the low end of the guidelines range. And Awoga's sentence of 102 months was within the guidelines range of 87 to 108 months. "[W]ithin-guidelines sentence[s] [are] presumptively reasonable," *United States v. Bard*, 73 F.4th 464, 480 (7th Cir. 2023), and there is a "'nearly irrebuttable presumption' that a below-guidelines sentence is reasonable," *United States v. Holder*, 94 F.4th 695, 700 (7th Cir. 2024) (quoting *United States v. Oregon*, 58 F.4th 298, 302 (7th Cir. 2023)). Defendants "can overcome this presumption 'only by showing that the sentence[s] do[] not comport with the [§ 3553(a) factors].'" *Id.* (last alteration in original) (quoting *United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018)). They have failed to make this showing.

Defendants suggest the district court failed to account for certain mitigation factors (even though each defense counsel answered in the affirmative when the district court asked whether it had addressed all of their mitigation arguments). And in any event, the court adequately considered defendants' lack of criminal history, low recidivism risk, financial struggles, and likely deportation after release from prison. The court also accounted for Awoga's age and language barriers, as well as Fandohan's employment as a nurse and her reduced culpability. It then balanced these considerations against the aggravating aspects of defendants' records, including the multiple minor victims, the long course of the

criminal conduct and its required planning, and Awoga's leadership role and lack of remorse.

Nor do we see an abuse of discretion in the district court's decision not to treat differing "cultural norms" in Benin as a mitigating factor. We do not intend to diminish the role that unique cultural values and norms might play in how someone raises or cares for a child. It certainly may be the case that Beninese parents acceptably engage in more frequent and severe physical punishment of, and demand more intensive household help from, their children. But, as the district court noted, defendants made the decision to live in the United States. And that decision came at the cost of accepting a metric that measures their culpable conduct against this country's laws.

At bottom, defendants' argument boils down to a disagreement with how the district court weighed the sentencing factors. And a "disagreement with how a court balances these countervailing factors does not make a sentence substantively unreasonable." *United States v. Cook*, 108 F.4th 574, 586 (7th Cir. 2024) (citing *United States v. Hatch*, 909 F.3d 872, 875 (7th Cir. 2018)); *see Holder*, 94 F.4th at 700 ("Although [defendant] might wish that the court had weighed the competing factors differently, '[s]uch a thorough review of the relevant information is simply not an abuse of discretion.'" (alteration in original) (quoting *United States v. Clay*, 50 F.4th 608, 613–14 (7th Cir. 2022))).

*            *            *

With no basis to disrupt the jury's verdict or the below- and within-guidelines sentences imposed, we AFFIRM the judgment of the district court.